UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | Cr. No. 07-109 (RMC) |
| : | |
| v. : | Violations: |
| : | 18 U.S.C. § 1956(h)(Conspiracy to Launder Monetary Instruments); |
| : | 18 U.S.C. § 1960 (Operating an Unlicensed Money Transmitting Business) |
| **DOUGLAS L. JACKSON,** : | |
| **Defendant** : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in aid of sentencing.

## BACKGROUND

Dr. Douglas Jackson was the driving force behind the creation and development of the digital currency system called E-gold. At all times relevant to this case, he held a controlling interest in Gold & Silver Reserve, Inc., the company that ran the E-gold digital currency system, and was a director of E-gold, Ltd. Dr. Jackson is now before the Court having pleaded guilty to Conspiracy to Launder Monetary Instruments and Operating an Unlicensed Money Transmitting Business, arising from the operation of the E-gold digital currency system. Gold & Silver Reserve, Inc. and E-gold, Ltd. have pleaded guilty to Conspiracy to Launder Monetary Instruments and Conspiracy to Operate an Unlicensed Money Transmitting Business. Dr. Jackson's business partners, Barry Downey and Reid Jackson, have pleaded guilty to violations of the District of Columbia Code for operating an unlicensed money transmitting business.

E-gold was founded, at least in part, based upon a philosophy that opposed government regulation of financial institutions and the banking industry. E-gold's founders and principals blindly followed that philosophy to the point of ignoring for over a decade laws designed to protect citizens from precisely the types of criminals that require anonymity, such as investment scammers. E-gold's design permitted users to conduct financial transactions anonymously on the Internet without regard for banking laws designed to identify and prevent criminal conduct. That feature was no accident or technical oversight. It was a founding principle of the business.[1] As a result, criminal activity flourished facilitated by E-gold. The E-gold system did not merely tolerate this illegal activity, it thrived on the profits generated from users eager to advance criminal objectives by taking advantage of E-gold's see-no-evil, hear-no-evil method of conducting worldwide financial transactions.

For the most part, these criminal E-gold users were not prohibited from operating after being identified, nor were criminal transactions reported to authorities. Instead, insignificant and ineffective restrictions were generally placed on the criminal accounts, which failed to prevent the users from anonymously withdrawing the proceeds of their criminal activity from the E-gold system.

---

[1] Dr. Jackson obviously was aware of E-gold's anonymous nature. In a January 2006 online interview published by Business Week, Dr. Jackson was asked how E-gold could make sure its customers did not use false identities, to which he responded: "E-gold essentially doesn't need to. Omnipay has to because it handles money. But e-gold doesn't need to, because [a customer] can come in and be Mickey Mouse. But we have his time stamps, his IP numbers, and we also know all of the other accounts he does business with. If his value is still in the e-gold, we're just itching to get the order to freeze it." In the same interview, Dr. Jackson confirmed that an E-gold account "may be opened with only an e-mail address, and that personal information [was not] verified." The absurdity of Dr. Jackson's notion that a customer is identifiable solely from "time stamps" and "IP numbers" is demonstrated by this case.

In some instances, customers were even encouraged to avoid E-gold's restrictions altogether by opening new, unrestricted accounts using funds transferred from restricted accounts.

Dr. Jackson has admitted that he operated E-gold as an unlicensed money transmitting business, and that he conspired to knowingly facilitate the transfer of the proceeds of investment scams using E-gold. The Court should impose a sentence that reflects the seriousness of these offenses.

## GOVERNMENT'S POSITION ON SENTENCING

### I.   Dr. Jackson Deserves a Significant Punishment Under the Guidelines.

The parties have stipulated that Dr. Jackson's adjusted offense level under the United States Sentencing Guidelines is 16 (including adjustments based upon the value of the laundered funds attributable to Dr. Jackson and his role as organizer or leader of criminal activity with less than 5 participants). After crediting Dr. Jackson for acceptance of responsibility, his offense level should be adjusted to 13. That level calls for a sentence of 12 to 18 months of incarceration. The government has agreed not to seek greater than 14 months of incarceration.[2]

---

[2] The government's guideline calculation differs from that of the Presentence Report, which calculates the amount laundered by Dr. Jackson to be $1,910,732.07, based upon a finding that Dr. Jackson is criminally liable for conduct attributed to the corporate co-defendants. The Presentence Report also applies a six-point adjustment for transactions that involved sexual exploitation of a minor. The government has stipulated in the plea agreement, and submits here, that Dr. Jackson is criminally liable only for the transactions listed in the Statement of Offense (and contained in paragraph 39 of the Presentence Report), rather than all of the transactions listed in the Superseding Indictment. The transactions in paragraph 39 all relate to one particular fraudulent investment scheme where specific evidence exists demonstrating that Dr. Jackson had direct knowledge of the fraud, as opposed to the other transactions where the corporations possessed criminal knowledge through multiple individuals. Further, because these stipulated transactions did not involve child exploitation, the six-level adjustment under §2S1.1(b)(2)(B) does not apply.

The government disagrees with the Probation Officer's response (at page 27 of Dr. Jackson's Presentence Report) to its objection to the Probation Officer's calculation of the amount of loss,

**II.     Dr. Jackson Deserves a Significant Punishment Under Section 3553.**

The government respectfully submits that the factors under Title 18, United States Code Section 3553(a) independently support a sentence of 14 months of incarceration.

  A.  Nature of the Offense

Money laundering is a serious offense, as it involves the promotion of other forms of criminal conduct. Further, the E-gold system demonstrates why the Congress created 18 U.S.C. § 1960. Section 1960 "was enacted and [later] amended in part to prevent terrorists, money launderers, and other criminals from exploiting unregulated banking systems. The more money that is transmitted by an unlicensed business, the more likely that some of that money will find its way into criminal hands, and hence, the greater the harm caused." *United States v. Bariek*, No. 01:05CR150 (JCC), 2005 WL 2334862, at *2 (E.D.Va. 2005) (imposing 18-month sentence for violation of 18 U.S.C. § 1960 based on defendant's operation of a "hawala" system that transmitted $4.9 million to Middle East countries).

   Dr. Jackson's offenses were clearly thought out and planned in great detail, and were not simply crimes of impulse. For years, Dr. Jackson dedicated his life -- including abandoning a successful and prestigious career as an oncologist -- to develop the E-gold business model. E-gold's anonymous financial transactions and lack of meaningful oversight went on for over a decade. Dr.

---

which relies upon purported statements made by U.S. Secret Service Special Agent Dotson. First, the government notes that it was not consulted concerning this issue. Second, the remarks attributed to Agent Dotson do not support the Probation Officer's conclusion that the loss amount should be higher than what the parties have stipulated in the plea agreement. Furthermore, should the Court construe Agent Dotson's comments as an assertion that an increased loss amount should apply, such an assertion by him would be incorrect.

Jackson and his co-defendants were undeterred throughout the pendency of this case, and even continued their enterprise post-Indictment, while under the Court's supervision.

      B.  <u>History and Characteristics of the Defendant</u>

According to the Presentence Report, Dr. Jackson enjoys the support of a loving family, including his wife, his children and his siblings. He was raised in a stable and supportive environment. Dr. Jackson graduated from medical school in 1982, successfully completed an internship in surgery, and developed a specialty in oncology. Dr. Jackson is obviously highly intelligent and capable of dedicating himself to productive, lawful endeavors.

Dr. Jackson's intelligence and education, however, are not mitigating factors. A person of Dr. Jackson's abilities is capable of distinguishing between right and wrong, and he clearly could have conformed his conduct to the requirements of the law. He chose not to, according to his public statements, in large part for ideological reasons. Dr. Jackson clearly knew better than to engage in this criminal enterprise, but did so anyway. He also used his talents to encourage and persuade others to participate in this conduct alongside him. Accordingly, Dr. Jackson's history and characteristics do not mitigate or justify his conduct in this case.

      C.  <u>The Need for the Sentence to Reflect the Seriousness of the Offense</u>

A sentence within the guideline range, up to 14 months of incarceration, would reflect the seriousness of Dr. Jackson's conduct and would provide just punishment for his actions.

      D.  <u>The Need for the Sentence to Afford Adequate Deterrence</u>

A guideline sentence of 14 months of incarceration would serve as an important deterrent to others who might be considering committing similar offenses. The digital currency industry will undoubtedly notice what happens in this case. A sentence below Dr. Jackson's guideline level may

have the unintended consequence of emboldening those who would follow in the footsteps of the defendants in this case by ignoring banking laws that are designed to detect and prevent criminal conduct.

    E.  <u>The Need to Provide the Defendant Educational or Vocational Training</u>

Unlike many other defendants who come before the Court, Dr. Jackson has had the advantage of a college and post-graduate education. He is not in need of educational or vocational training.

## CONCLUSION

The United States respectfully requests that the Court sentence Dr. Jackson under the sentencing guidelines to 14 months of incarceration, and in accordance with the factors articulated in 18 U.S.C. § 3553(a), to punish him for his conduct and to deter others who might consider committing similar misconduct.

    Respectfully submitted,

    JEFFREY A. TAYLOR
    UNITED STATES ATTORNEY

By:    /s/
    Jonathan W. Haray, D.C. Bar No. 480140
    Assistant United States Attorney
    555 Fourth Street, N.W.
    Washington, DC 20530
    (202) 353-2877
    jonathan.haray@usdoj.gov

    Kimberly Kiefer Peretti
    Senior Counsel
    U.S. Department of Justice
    Computer Crime and Intellectual Property Section, Criminal Division
    1301 New York Ave., NW, Suite 600
    Washington, D.C. 20530
    (202) 353-4249
    kimberly.peretti@usdoj.gov

>Laurel Loomis Rimon
>Deputy Chief for Litigation
>U.S. Department of Justice
>Asset Forfeiture and Money Laundering Section, Criminal Division
>1400 New York Ave., NW, Room 2200
>Washington, D.C.   20530
>(202) 514-1315
>*Laurel.Loomis.Rimon@usdoj.gov*