UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | Cr. No. 07-109 (RMC) |
| : | |
| : | Violations: |
| : | 18 U.S.C. § 1956(h)(Conspiracy to |
| v. : | Launder Monetary Instruments); |
| : | 18 U.S.C. § 371 (Conspiracy to violate 18 |
| : | U.S.C. § 1960) |
| **E-GOLD, LTD.,** : | |
| : | |
| **Defendant** : | |
| : | |
| : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in aid of sentencing.

## BACKGROUND

E-gold, Ltd. ("E-gold") is an internet-based digital currency system and is before the Court, along with its sister company, Gold & Silver Reserve, Inc. ("G&SR"), which is the operator of the system, having pleaded guilty to Conspiracy to Launder Monetary Instruments and Conspiracy to Operate an Unlicensed Money Transmitting Business. Three individual co-defendants are also before the Court: Dr. Douglas Jackson, creator and director of the operation, having pleaded guilty to Conspiracy to Launder Monetary Instruments and Operating an Unlicensed Money Transmitting Business, arising from the operation of the E-gold digital currency system; and Dr. Jackson's business partners, Barry Downey and Reid Jackson, having pleaded guilty to violations of the District of Columbia Code for operating an unlicensed money transmitting business.

E-gold was founded, at least in part, based upon a philosophy that opposed government regulation of financial institutions and the banking industry.  E-gold's founders and principals blindly followed that philosophy to the point of ignoring for over a decade laws designed to protect citizens from precisely the types of criminals that require anonymity, including child pornographers and investment scammers.  E-gold's design permitted users to conduct financial transactions anonymously on the Internet without regard for banking laws designed to identify and prevent criminal conduct.  That feature was no accident or technical oversight.  It was a founding principle of the business.  As a result, criminal activity flourished facilitated by E-gold.  The E-gold system did not merely tolerate this illegal activity, it thrived on the profits generated from users eager to advance criminal objectives by taking advantage of E-gold's see-no-evil, hear-no-evil method of conducting worldwide financial transactions.

A January 9, 2006 Business Week article entitled "Gold Rush: Online Payment Systems Like E-gold Ltd. Are Becoming The Currency of Choice for Cybercrooks," stated:

> A tour of some outlaw corners of the Internet illustrates why [law enforcement was interested in the E-gold system].  One Web site called CC-cards -- where cyberthieves sell pilfered bank account and credit-card information -- often asks for payment via e-gold.  Some sites pushing child pornography have dropped Visa and MasterCard recently in favor of e-gold, according to the National Center for Missing & Exploited Children, which tracks underage porn.

These examples were not unique.[1]  Indeed, the E-gold system's own computer records demonstrated how popular E-gold became among criminal users.  When agents executed a search

---

[1] As further example, FoxNews ran two stories (in early 2004 and 2006) on the potential, and in some circumstances actual, use of e-gold as a payment mechanism for, among other things, online investment scams online child pornography.

2

warrant at E-gold's business office in December 2005, they found internal records showing that E-gold had identified more than 3,000 accounts involved in buying or selling child pornography, more than 13,000 accounts involved in various types of investment scams, and more than 3,000 accounts involved in credit card fraud.[2]

For the most part, these criminal E-gold users were not prohibited from operating after being identified, nor were criminal transactions reported to authorities. Instead, insignificant and ineffective restrictions were generally placed on the criminal accounts, which failed to prevent the users from anonymously withdrawing the proceeds of their criminal activity from the E-gold system. In some instances, customers were even encouraged to avoid E-gold's restrictions to open new, unrestricted accounts using funds transferred from restricted accounts.

The defendant corporations have admitted to conspiring to launder millions of dollars in profits known to be derived from child pornography, investment scams and credit card fraud.

## GOVERNMENT'S POSITION ON SENTENCING

**I.     E-gold's Fine Calculation**

Defendant E-gold pleaded guilty to one count of conspiracy to launder money and one count of conspiracy to operate an unlicensed money transmitting business. These two counts are grouped for sentencing purposes under USSG § 3D1.2(d), and the parties have stipulated that E-gold's highest adjusted offense level under the United States Sentencing Guidelines is 32 (including adjustments based upon the value of the laundered funds attributable to E-gold, E-

---

[2] The number of actual criminal accounts is likely much higher than what E-gold identified on its own. The few employees hired by E-gold to review accounts were inexperienced and untrained in financial matters. E-gold clearly did not allocate sufficient resources to detect all the criminal activity taking place via millions of electronic customer accounts.

gold's knowledge that the funds were involved in child exploitation, and conviction under 18 U.S.C. § 1956).

Under the Sentencing Guidelines, based upon an offense level of 32, the base fine for E-gold would be $17,500,000. As calculated in the Presentence Report, with a culpability score of 5 (including 1 additional point based upon the size of the defendant corporation and involvement of the principals, and the reduction of 1 point for acceptance of responsibility[3]), the guideline fine range is $17,500,000 to $35,000,000. However, the maximum fine pursuant to 18 U.S.C. § 1956 is $500,000 or twice the value of the property involved in the money laundering transactions, and the maximum fine pursuant to 18 U.S.C. § 1960 is $500,000. Thus, the maximum fine for these grouped offenses is twice the value of the property involved in the money laundering transactions, or $3,738,387.30.[4] *See* USSG § 8C3.1(b) ("Where the minimum guideline fine is greater than the maximum fine authorized by statute, the maximum fine authorized by statute shall be the guideline fine.").

The parties stipulated in the plea agreement that $3,737,387.30 would be an appropriate part of E-gold's sentence. However, the parties agreed that E-gold could reserve its right to

---

[3] E-gold may assert that a 2 point reduction for acceptance of responsibility is appropriate, on the basis of its cooperation in the investigation, including providing copies of its system database to the government and freezing and turning over the value of e-gold accounts involved in criminal activity. However, all of those undertakings were done in response and compliance to court orders obtained by the government, not voluntarily. Nor were they offered voluntarily to the government prior to the court orders.

[4] This number differs from the $3,821,464.14 calculated in the Presentence Report. The basis for this difference appears to be that the number in the Presentence Report includes "The 'LS' Transactions" listed in paragraph 43 of the Superseding Indictment. The amount of $3,738,387.30, which the parties stipulated to in the Plea Agreement as being twice the value of the laundered funds, does not include the "The 'LS' Transactions" in recognition that the government's proof on these transactions was not as strong as the others.

argue for a reduction of the stipulated fine based upon an inability to pay pursuant to USSG § 8C3.3, and that the government would not object to such an argument "if, after reasonable inspection of the Company's financial records, the Government agrees that the Company is truly unable to pay the Stipulated Fine." Plea Agreement para. 4.

Additionally, E-gold agreed, jointly with G&SR, to criminal forfeiture in the form of a money judgment of $1,750,000, which will be paid by consent from funds under seizure in related Civil Action 07-1337 (RMC). No additional outlay of funds will be required from the defendant corporations to satisfy this forfeiture judgment.

## II.   E-gold's Ability to Pay

As mentioned above, the parties agreed in the Plea Agreement that E-gold may argue for a reduction of its fine based upon USSG § 8C3.3 (Reduction of Fine Based on Inability to Pay), which states:

> (a)   The court shall reduce the fine below that otherwise required by § 8C1.1 (Determining the Fine - Criminal Purpose Organizations), or § 8C2.7 (Guideline Fine Range - Organizations) and § 8C2.9 (Disgorgement), to the extent that imposition of such fine would impair its ability to make restitution to victims.
>
> (b)   The court may impose a fine below that otherwise required by § 8C2.7 (Guideline Fine Range - Organizations) and § 8C.29 (Disgorgement) if the court finds that the organization is not able and, even with the use of a reasonable installment schedule, is not likely to become able to pay the minimum fine required by § 8C2.7 (Guideline Fine Range - Organizations) and § 8C2.9 (Disgorgement).
>
> *Provided*, that the reduction under this subsection shall not be more than necessary to avoid substantially jeopardizing the continued viability of the organization.

Pursuant to this provision, a sentencing court is not *required* to consider whether a defendant can pay a fine, as long as the ability to pay restitution is not impaired. *United States v. Eureka*

*Laboratories*, 103 F.3d 908, 913 (9th Cir. 1996); USSG § 8C2.2.  In this case, therefore, as there are no identifiable victims associated with the charges, the court is not required to consider a reduction of the fine.  In fact, "even if the district court's fine would completely bankrupt [the corporation], neither section 8C3.3(a) nor section 8C3.3(b) preclude[] the court from imposing such a fine . . ."  *Id.* at 912.  *See also United States v. Four Pillars Enterprise Co., Ltd.*, 253 F3d. Appx. 502, 514 (6th Cir. 2007).

Nonetheless, a sentencing court may, in its discretion, reduce the fine of a corporation if it is not able to pay the minimum fine.  USSG § 8C3.3.  Application Note 1 to USSG § 8C3.3 states that "[f]or purposes of this section, an organization is not able to pay the minimum fine if, even with an installment schedule under § 8C3.2 (Payment of the Fine - Organizations), the payment of that fine would substantially jeopardize the continued existence of the organization."  Here, E-gold has provided some information indicating a reduced ability to pay the minimum fine, but not enough to demonstrate a complete inability to pay a fine.

First, E-gold only provided relevant financial information to the government on November 12, 2008, two days before this Sentencing Memorandum was due to be filed, and review of that information has been difficult because of the short time frame and numerous questions that are not answered on the face of the documents themselves.  While lists of assets and liabilities of G&SR, and E-gold, as well as the two combined, was provided, the information was not compiled by an independent auditor, but by the same in-house accountant that has worked for the defendant companies for years.  It does not appear that the statements provided comport with generally accepted accounting principals, and some information is listed as "estimated," or is incomplete.  For example, the lists of assets and liabilities was comprised

mostly of abbreviations such as "RR XAU" or "EG USD," which made it difficult to discern the actual nature of the line items. Fixed assets of the companies were not accounted for.[5] And, approximately $300,000 in silver metal holdings was listed but not included in the assets available.[6]

Further, it is extremely difficult, upon reading the information provided by the defendant corporations recently and in the Presentence Report, to reconcile the assets and liabilities listed among the two companies to determine the true financial standing of the defendant corporations. For example, E-gold's Presentence Report lists "Estimated Operator Payments" – which the government knows are amounts paid to G&SR – ranging from $96,000 to $836,000 per month. However, G&SR's Presentence Report only states that "GSR receives payment from E-Gold" for acting as "Operator," without providing amounts. Also, G&SR provided the government with a list of future monthly operating expenses of approximately $258,000[7], but did not provide any specific information or projections on future income.

Most significantly, the bulk of the liabilities of both G&SR and E-gold are owed to the individual co-defendants themselves, and are amounts advanced to the companies over the years. For example, G&SR and E-gold provided the government with a combined list of assets and liabilities, which includes $1,230,765.30 in amounts owed to the individual co-defendants out of

---

[5] We have since been advised that the fixed assets are roughly estimated to be worth $50,000.

[6] The "e-silver" was listed in the Presentence Report as "not liquid," although it was described in the document provided to the government as "liquid in 60-90 days."

[7] Monthly operating expenses of approximately $269,000 are listed in G&SR's Presentence Report.

a total of $1,979,359.28 in combined liabilities.  As the amounts owed to co-defendants have likely been pending for some time and are not expected or required to be paid in full immediately, at least some portion of that amount would be available to pay a fine.

As of the time of filing of this memorandum, counsel for defendant corporations G&SR and E-gold are continuing to provide the government with information relevant to the ability to pay a fine, and have indicated that an outside accountant may be available prior to the date of sentencing for further information.  Accordingly, further clarity on this issue may be available by or at the time of sentencing.

**III.    Factors under Section 3572**

Under 18 U.S.C. § 3572, a sentencing court must consider several factors in deciding whether to impose a fine and in what amount, in addition to the ability to pay which is discussed above.  Those factors include: the burden of the fine on the defendant or his/her dependants; any pecuniary loss to others caused by the offense; whether restitution is ordered; the need to deprive defendant of illegal gains; expected costs to the government of imprisonment, supervised release, or probation; whether the costs of the fine can be passed to consumers or others, and; the size of the organization and any discipline taken by the organization against responsible individuals.

The government does not believe that E-gold profited substantially in operating its business during the course of the conspiracy, although the profits it did earn were the result of twelve years of an illegal operation and a huge volume of third party criminal activity.  The government also does not believe that E-gold directly caused loss to others, although it can be argued that its facilitation of wide-spread fraud indirectly caused loss to numerous individuals.  Nonetheless, restitution is not required here, because the defendants' crimes did not result in

identifiable victims of their specific conduct.  Further, the government does not expect to bear significant costs in the course of E-gold's probation.  Also, E-gold is a relatively small company, and, although its principals were intimately involved in the criminal conduct and also convicted, it appears to be making a strong effort to turn itself into a law-abiding operation.  On the other hand, E-gold can presumably modify its customer fees to some extent if necessary to assist it in paying a fine.

### IV.     Government's Recommendation

Ultimately, it is the government's view that E-gold has not entirely established an inability to pay a fine.  Yet, the government does believe that the defendants in this case have dedicated themselves since entry of their guilty pleas, and even before, to coming into compliance with relevant statutes and regulations, and to complying with the specific terms of the plea agreement.  We are also aware, and have seen documentation showing, that the defendants have expended substantial amounts of money in doing so, although it bears noting that these funds would have been better spent at the initiation of the business.  And, although reaching any certainty on the issue is difficult given the lack of transparency and completeness of the documents provided, the government does not believe E-gold has substantial and un-obligated liquid assets available to pay an immediate fine.

Further, we recognize that the defendant corporations are in a financially precarious position, with no certainty that their new business model will ever become self-sustaining or profitable.  However, this convicted business has operated illegally and profited from criminal activity for over a decade, and is just now expending the resources necessary to make the radical changes necessary to become law-abiding.  As a result, given that this business appears to have

some assets available, the government believes some fine, paid in monthly installments, would be appropriate.

## V.     Probation

Pursuant to the Sentencing Guidelines, E-gold is subject to a term of probation of at least one year, but not more than five years.  It is the government's recommendation that a three year period of probation would be appropriate here, given the substantial operational changes that need to occur for the defendant corporations to ensure they are no longer providing a platform for rampant criminal activity.  Further, a three year period is consistent with E-gold's obligation under the plea agreement regarding supervision by the Internal Revenue Service of its compliance with Bank Secrecy Act laws.

## CONCLUSION

The United States respectfully requests that E-gold be sentenced to a term of probation of three years, and to some amount of a fine that is commensurate with its ability to pay over a period of time, to punish it for its conduct and to deter others who might consider committing similar misconduct.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY

By:     /s/
Jonathan W. Haray, D.C. Bar No. 480140
Assistant United States Attorney
Fraud & Public Corruption Section
555 Fourth Street, N.W.
Washington, DC 20530
(202) 353-2877
jonathan.haray@usdoj.gov

Kimberly Kiefer Peretti
Senior Counsel
U.S. Department of Justice
Computer Crime and Intellectual Property
Section, Criminal Division
1301 New York Ave., NW, Suite 600
Washington, D.C.  20530
(202) 353-4249
*kimberly.peretti@usdoj.gov*

Laurel Loomis Rimon
Deputy Chief for Litigation
U.S. Department of Justice
Asset Forfeiture and Money Laundering
Section, Criminal Division
1400 New York Ave., NW, Room 2200
Washington, D.C.  20530
(202) 514-1315
*Laurel.Loomis.Rimon@usdoj.gov*